**PLAINTIFFS' EXHIBIT A**

**TO MOTION FOR PRELIMINARY INJUNCTION**

**CIV. NO. 18-01691**

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| Ginger Kathrens, et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civ. No. 18-01691 |
| v. ) | |
| ) | |
| Ryan Zinke, et al., ) | |
| ) | |
| Defendants. ) | |

**DECLARATION OF GINGER KATHRENS**

1. I am an Emmy award-winning producer, cinematographer, writer, editor, and public speaker. I have dedicated the past 24 years to the observation and documentation of wild horses in ten western states. I am also the founder and Executive Director of the Cloud Foundation, a nonprofit 501(c)(3) organization dedicated to the preservation and welfare of America's wild horses, particularly the Pryor Mountain Herd. I am submitting this declaration in support of Plaintiffs' motion for injunctive relief, both in my capacity as an individual Plaintiff and on behalf of The Cloud Foundation.

2. I have studied and documented wild horses since 1994, and produced three award-winning films that chronicle the life of Cloud, a wild stallion. The films, Cloud: Wild Stallion of the Rockies; Cloud's Legacy: The Wild Stallion Returns; and Cloud: Challenge of the Stallions aired on PBS's Nature series. I wrote, edited, and produced over two dozen segments of the Wild America series for PBS, and have filmed for National Geographic, the Discovery Channel, Animal Planet, and the BBC. I have also

1

authored three natural history books about Cloud, and dozens of articles about wild horses and burros. My documentation and analyses of wild horse behavior have been compared to Jane Goodall's work with chimpanzees. These works have been pivotal in stimulating public interest, and have significantly contributed to a national dialogue about the government's treatment of wild horses.

3. I speak throughout the United States about the plight of wild horses on public lands. I am also a frequent speaker on the subject of wild horse management, and have shared my experience and views at a National Academy of Sciences meeting in California; the 2012 International Equine Conference in New York; the 2013 American Equine Summit in New York; Equine Affaires in Massachusetts, Ohio, and California; the Rocky Mountain Horse Expo in Colorado; the Horse Expo in California; the Midwest Horse Fair in Wisconsin; and Breyerfest in Kentucky, in addition to speaking at the Carnegie Museum of Natural History and the Denver Museum of Natural History, and several other colleges, universities, high schools and elementary schools throughout the United States. I use these speaking opportunities to educate families and particularly children, and to inspire compassion for wild horses and all animals, in the hope that the public will advocate for more humane treatment and management of wild horses by the Bureau of Land Management ("BLM"). I have also testified before Congress on wild horse issues, which I regard as an opportunity to persuade policy makers to mandate more protective and humane management of wild horses.

4. I founded the Cloud Foundation out of my knowledge and fear for the fate of not only Cloud's herd, but other wild horses in the West. I currently serve as the Executive Director. The Foundation is dedicated to preventing the extinction of Cloud's herd—the

genetically unique Pryor Mountain Mustangs that descended from the original Colonial Spanish horses brought to the Americas by Spanish conquistadors. The Foundation is also determined to protect other wild horse herds on public lands. To these ends, The Cloud Foundation advocates for the humane treatment, preservation, and management of wild horses on and off the range. We regularly comment on the federal government's proposed management actions, and endeavor to provide information to federal agencies, including BLM, to help inform their management actions. The Cloud Foundation also works to inform the public about Cloud's herd and legacy. We regularly publish stories and updates about the Pryor Herd for our followers around the world on various social media. The Cloud Foundation's Facebook page alone has over 400,000 followers.

5. In October 2015, Congressman Raul Grijalva, who was the ranking member of the Natural Resources Committee of the House of Representatives, nominated me to serve on the National Wild Horse and Burro Advisory Board. Congress created the Advisory Board in the Wild Free-Roaming Horses and Burros Act to consist of people with "special knowledge about the protection of horses and burros" who can provide advice "on any matter relating to wild free-roaming horses and burros and their management and protection." 16 U.S.C. § 1337. In nominating me to serve on the Advisory Board, Congressman Grijalva described how "[t]he federal government, acting through the BLM, has a responsibility to humanely manage wild horses and burros in a transparent and open manner." Congressman Grijalva nominated me because, as he put it, I "always seek[] to create humane sustainable management policies with a dialogue-first approach to resolving conflicts." When nominating me for the Advisory Board Congressman Grijava further explained that "[d]eveloping a strategy that limits roundups and decreases

reliance on holding facilities, allowing herds to roam the range as they are intended, requires additional reforms and changes to current policy."

6. In March 2016, the Secretaries of the Interior and Agriculture appointed me to serve on the BLM's National Wild Horse and Burro Advisory Board. *See* Attachment. In its announcement of my appointment, the BLM noted my experience as a documentarian, and my long history of advocacy for the preservation and welfare of wild horses as the founder and Executive Director of the Cloud Foundation. In that same announcement, the BLM noted that the "Advisory Board advises the BLM . . . on the management and protection of wild free-roaming horses."

7. I consider my service on the Advisory Board to be a very serious responsibility that requires me to provide informed input on the BLM's policies and practices for managing wild horses. As the Humane Advocate on the BLM's Advisory Board, it is my duty to explain to the BLM and the public that its upcoming sterilization experiments are not humane or socially acceptable, and to oppose the implementation of these procedures in the future. I acknowledge that I speak for myself on this issue and do not in any way speak for the entire National Wild Horse and Burro Advisory Board.

8. With this proposed spay feasibility study, the BLM is attempting to fundamentally transform its management of wild horse populations by moving to a strategy based on the permanent sterilization of these wild animals. The experiments that the BLM is now planning to conduct in the Hines Corral are likely to shape the BLM's future management of wild horses through sterilization. In fact, the BLM chose the experimental ovariectomy by colpotomy procedure because it hopes to be able to perform these procedures on wild horses on public rangelands in areas across the United States.

9. Because sterilizing wild horses robs the horses of their defining behaviors which will fundamentally change the organization and behavior of wild horse herds, and because it is not possible to humanely sterilize wild horses in on-the-range conditions, for many years the Cloud Foundation and I have strongly opposed the BLM's efforts to move to sterilization-based wild horse population management. Since 2012, the Foundation and I have advocated for the control of wild horse fertility using a temporary, reversible contraceptive called Porcine Zona Pellucida ("PZP"). Because PZP does not fundamentally alter the behavior of wild horses or permanently deprive them of the reproductive behaviors that define their lives and herd structures, and because the administration of PZP involves a simple shot instead of invasive surgery, PZP represents a far more humane and socially acceptable way to manage the population growth rates of wild horse herds where natural management by predators is not occurring.

10. I have deep concerns about the BLM's sterilization experiments at the Hines Corrals. As a general matter, the BLM's movement toward permanent sterilization of wild horses is a step in the wrong direction. Additionally, the BLM's decision to conduct ovariectomy via colpotomy sterilization procedures is unwise and inhumane. Because this is a blind procedure that requires the identification and removal of ovaries by touch alone, this procedure carries enormous risks for wild mares and for the foals they carry. I do not believe this procedure can be performed humanely even in a controlled setting, much less in the uncontrolled conditions of the public range.

11. My belief that ovariectomy via colpotomy is particularly inhumane was initially informed by my experience discussing the terrible consequences that this procedure has had in the past. In May 2016, I received a call from a person in Phoenix, Arizona, who had

witnessed this procedure being performed on a mare and wild female burros that had been removed from the Lake Pleasant Herd Management Area north of Phoenix. This procedure was performed by the same individual (Leon Pielstick) who has been hired to do the research at issue in this case. The caller, who wished to remain anonymous, told me that she had encouraged the performance of this procedure in the hope that it could be a safe and humane way to control population growth in wild horses and burros, which might help prevent future traffic accidents involving these animals. However, the caller informed me that after the surgery, at least one burro bled out after the surgery and that the horse died shortly afterwards. Because the ovariectomy via colpotomy procedure led to inhumane and deadly results, the caller no longer believed that it was a humane or acceptable way to manage the populations of wild horses and burros. This experience proved to me that when confronted with the reality of this procedure, the public will not find it acceptable. In order to inform the public about these inhumane results, The Cloud Foundation issued a press release describing the surgery's negative consequences for wild horses and burros.

12. Because my long experience as a documentarian has proved that documentary evidence is essential to effective public education and advocacy for wild horse welfare, before the BLM's planned 2016 sterilization experiments I joined a group of wild horse advocates to request that the BLM provide access to observe and document the upcoming experiments at the Hines Corral. Our request explained the importance of public observation, especially because BLM is performing these experiments to shape its future wild horse population management actions and because one of the BLM's previously

stated goals for these experiments was to determine whether these experimental procedures can be considered socially acceptable.

13. The BLM denied our initial request, claiming that public observation would require too much space in the Hines Corral's indoor chute area and would be disruptive, potentially putting the horses and the researchers at risk of injury.

14. Although we disagreed with the BLM's reasoning, as described in more detail below we attempted to address each of the BLM's concerns by sending a second, more limited request for access. In our second request, instead of asking for the ability to have a live observer present for the experimental procedures, we requested that the BLM allow us to purchase and install small, unobtrusive cameras that could record and live-stream the experiments, and similar cameras that could provide round-the- clock observation of horses in post-surgical recovery. We specifically explained that any form of public observation, whether live or remote, would help the BLM achieve what it previously represented was one of its principal goals of determining whether these procedures are "socially acceptable," and that our proposal to install cameras for post-surgical observation would also further the BLM's goal of promoting humane outcomes for any wild mares that suffer from complications, by making it more likely that those complications could be caught and treated at an early stage.

15. The BLM also denied our second request, claiming that the mere presence of cameras, no matter how small or unobtrusive, would be disruptive to the experiments. The BLM did not address at all, in either of its denials of our two requests for access to observe these experiments, the fact that public observation is the best way for the agency to assess the social acceptability of the experimental procedures. Nor did the agency offer any

explanation for its denial of our request for access to install cameras to provide post-surgical observation of the wild mares subject to these experiments.

16. Further, the BLM's stated reasons for denying our multiple requests for access to observe and document its upcoming sterilization experiments did not make any logical sense. For example, the refusal to allow cameras to provide round-the-clock observation of mares in post-surgical recovery makes no sense in light of the fact that the BLM plans to allow in-person observation of the mares during recovery.

17. BLM's concern that observers could disrupt these procedures and cause risks to the horses and researchers also does not comport with my experience at the Hines Corral facility. I have visited the Hines Corral on two occasions. Roughly five years ago, I visited the Corral to view the facility and observe the BLM's care of horses kept there. In April 2016, I attended a BLM-led guided tour of the Hines Corral for the Advisory Board. I was able to observe and photograph wild horses held at the facility and to observe the hydraulic chute where the BLM will perform its experiments on the wild mares. (True and accurate copies of two photographs I took at the Hines Corrals are attached to this declaration. The photographs have not been altered in any way, except that out of respect for the privacy of other observers, I had an employee of the Cloud Foundation blur the faces of the other observers.) The chute sits in a metal building near the front door. At least 15 people were able to stand near the chute and see the location where the BLM will conduct its upcoming experiments. The facility has places to put cameras atop a panel where it can unobtrusively record a view of the experimental procedures. During the tour, eight other observers and I, in addition to BLM employees, had room to watch Dr. Pielstick, a veterinarian working with the BLM, perform an

ultrasound on a wild mare. At no time did the presence of numerous observers seem to alter Dr. Pielstick's ability to perform the ultrasound, and members of this large group were able to witness the procedure, myself included. While Dr. Pielstick performed a procedure on a wild horse in the very chute where the BLM's proposed sterilization is to take place, with his arm in a wild mare's vagina, he narrated his actions and answered our questions. Therefore, based on my own experience in this interior setting, there is room in the Hines Corral's indoor chute area for observers. If it could accommodate 15 people or more, it could surely accommodate several persons to observe in addition to the surgical team.

18. In 2016, the Cloud Foundation and I joined another wild horse advocacy organization in a lawsuit to stop the sterilization experiments. *Kathrens v. Jewell*, No. 2:16-cv-01650-SU (D. Or. filed Aug. 15, 2016). The BLM chose to drop the plan after we filed our Preliminary Injunction. Now, the BLM is attempting to move forward two years later while still not providing for meaningful public observation of the study, and without any consideration for the social acceptability of the procedure or the humane treatment of the mares.

19. In this new study, the BLM has not provided an adequate area for public observation. This vantage point, which is described and depicted at pages 27-28 of the Final Environmental Assessment, offers an impossible angle of sight and filming of the procedure—in fact, the observers will only be able to see the equipment, but not the horse. The goal of observing is to actually be able to view the procedure, as well as the reactions and treatment of the horses. This will simply not be possible under the BLM's planned observation restrictions.

20. The BLM also plans to place the observers behind a glass window. This means that, not only will it be difficult to clearly film or photograph the procedure, but, significantly, none of the observers will be able to *hear* what is happening inside the surgical area. As a videographer, this significantly infringes on my ability to provide a complete picture of the procedures. Audio will be an extremely important component to understanding what is going on during the procedures, including how the horses react to the procedure. Not only will we not be able to hear when a mare makes sounds of distress, but observers will also be unable to hear if the lead vet calls for assistance, and if he does, the reasons for why he has done so. The lead vet could call for assistance in addressing life-threatening issues, such as a mare bleeding out or otherwise in significant distress. Therefore, audio—as well as a clear viewing opportunity—is an important aspect to understanding and informing the public about this procedure, in furtherance of ascertaining whether the procedure is humane and socially acceptable.

21. BLM's limitation on the public's ability to observe and document its upcoming sterilization experiments make so little sense. Therefore, the fact that BLM never considered how public observation could further the agency's own previously stated goal of ascertaining whether this management tool is "socially acceptable" leads me to believe that the BLM simply does not want the public to witness these experiments, to know what is actually entailed or how the horses are treated. As the humane member of BLM's Advisory Board, I believe it is my duty to ensure that these experiments can be accurately documented by observers in order to inform the public about the true nature and scope of this controversial procedure, especially when BLM has made it clear that it intends to use

the results of this experiment to undertake the same procedures on pregnant mares on the range.

22. My long experience as a documentarian and advocate for wild horse protection and welfare has proved to me that the public only considers wild horse management practices "socially acceptable" if the public finds that those practices are actually humane. Similarly, my experience has proved to me that the best way to determine whether the public believes a management practice is humane is to actually show the public what is really entailed in the practice and what is happening to the horses, so that the public will have the information it needs to engage with BLM on whether this procedure is socially acceptable. This approach, which I have employed for decades, is what I believe Congressman Grijalva meant when, in nominating me for this position, he said that I "always seek[] to create humane sustainable management policies with a dialogue-first approach to resolving conflicts." My long-held and firm belief is that this "dialogue-first approach" only works when the public can receive a candid, truthful, and thorough account of what the BLM is actually doing to wild horses.

23. The BLM's limitations on public observation and documentation in its upcoming wild mare sterilization experiments makes it impossible to provide the public with a candid, truthful, and thorough account of what is entailed in this procedure, and what these wild mares will endure. In turn, this severe limitation on public access makes it impossible for me to gather either first-hand accounts or feedback from the public—essential to the performance of my duties as the Humane Advocate on the BLM's Advisory Board.

24. For similar reasons, the BLM's limitations on public observation and documentation are significant obstacles to the Cloud Foundation's advocacy for the protection and welfare

11

of wild horses. Without the ability to observe and document these experiments, the Cloud Foundation will be forever deprived of a chief strategy for public education and advocacy on this issue.

25. The inability to meaningfully witness and document the experiments at the Hines Corral will also unquestionably impair my ability as the Advisory Board's Humane Advocate and the ability of the Cloud Foundation to provide informed comments on whether the BLM can or should implement these experimental procedures on the range in the future. Denying a meaningful method of witnessing the experiments, both in person or via live transmission at the Hines facility, will irreparably impede our ability to accurately inform the public about the ramifications of this method of wild horse management, and will also make it difficult for us to obtain the information we need to comment on the advisability of using this management practice in the future *on the range.* Indeed, without a meaningful way to observe and record this research, I and the Cloud Foundation will simply not be able to obtain all the information we will need to fully comment on whether BLM should be able to perform these experiments in the field, and, if so, what additional measures must be taken to ensure that any such procedures are as humane as possible. In short, the inability to meaningfully observe these experiments will irreparably deprive me and the Cloud Foundation of information that we need to conduct our advocacy efforts and provide informed commentary concerning whether, under what circumstances, and pursuant to what protocols, BLM should ever implement these procedures on the range.

26. As a wild horse documentarian, with many years of experience filming wild horses, I can say with complete confidence that the arrangement BLM has designed for public

observation of this practice, is completely inadequate for the purpose of recording a true and accurate account of what is entailed.

27. At an absolute minimum, BLM must allow a licensed equine veterinarian to be in the room where the surgeries will be performed, who can record what occurs on a video camera. If for some reason this cannot be arranged, then, alternatively, BLM must make arrangements to have a video and audio camera mounted in the room in a way that would allow a full recording of what occurs. In addition, BLM must arrange to have video and audio recording equipment in the recovery pens that will also record what occurs during recovery.

28. As a wild horse documentarian, I have come to have a great appreciation for wild horse behaviors and social band structure. In all of my research, including documenting wild horses in the wild, at roundups, and at wild horse holding facilities, I have come to realize how completely contrary to their social instincts and terrifying it would be for a wild horse to be forced to enter a roofed enclosure with walls, artificial light and magnified sound. On top of that, the mares will be entering the surgical room alone. The mares will be forced to go against all of their wild behaviors and instincts as social creatures organized to survive in family units and to flee from danger. In documenting wild horses, I witnessed a mare walk to the edge of a dark forest. She paused just outside of the trees and waited for her stallion to come and lead her into the woods. In the Hines Corral, the BLM will be asking these mares to enter a comparatively dark, artificially lit room, similar to the woods, without the comfort of their stallion(s) or the rest of their band. Therefore, all of the mares will be in a heightened state of stress. The BLM must accommodate for these responses for the safety of the wild horses and the handlers.

29. In addition, from my personal experience, and as seen in the photos provided by the BLM, I note that the surgical area at the Hines Corral is old and filthy. This area is nowhere near being a completely sterile surgical operating room that would be appropriate for conducting any surgical procedure. As a documentarian, I have filmed at numerous equine surgical facilities, including Marion DuPont Equine Medical Center/Virginia Tech, Veterinary Large Animal Teaching Hospital/Texas A&M University, Tufts University, Cummings Veterinary Medical Center/Tufts University and the Littleton Equine Medical Center in Colorado. In stark contrast to legitimate equine surgical facilities is the Hines Corral facility in Oregon, BLM has referred to it as a "semi-sterile" environment. There is no such thing. Hines is old, filthy, and hardly state of the art. It is appalling to consider it as a viable venue for such major, invasive surgeries like ovariectomy via colpotomy.

30. I also have various concerns about BLM's plan to immediately move the mares outside, into a dirt corral. In the video that BLM released with the Environmental Assessment for this study, the mare runs away from the chute, through the dirt. This is extremely dangerous for the mares. The mares will have free roam to roll or be kicked by the other mares that are in this small holding pen. If a mare were to roll, she would greatly increase her risk of colic or hemorrhage.

31. Further, the mares will have an increased risk of being kicked when they are transferred to the secondary pen where mares will be with their foals. Mares in general, and especially wild mares with foals, are not friendly to other mares. In my experience documenting wild horses in the wild, I have seen mares kick and bite at each other, but, at least in the wild they have the ability to move away from each other. However, in a

confined space, and after just undergoing surgery, these mares will be unable to avoid a kick from another mare. In addition, allowing mares who have just had a hind end surgery to kick each other in the hind end will also increase the risk of post-surgery complications.

32. For all the reasons listed above, I am providing this declaration in support of the Plaintiffs' motion for injunctive relief. As Congressman Grijalva noted, "[t]he federal government, acting through the BLM, has a responsibility to humanely manage wild horses and burros in a transparent and open manner." I do not believe that these actions should proceed as they are fundamentally inhumane and dangerous. Further, the BLM's arbitrary limitation on the public's ability to meaningfully observe and record these experiments is completely at odds with my responsibility and, as described above, will irreparably harm my ability to view and record these procedures, and to obtain critical information about what is entailed in conducting these procedures, which in turn will irrevocably impair my and the Cloud Foundations' ability to disseminate this important information to the public, and to obtain the information we need to provide fully informed comments on whether, and under what circumstances and pursuant to what procedures BLM should be able to conduct such surgeries on wild horses on the range.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States, that to the best of my knowledge the foregoing is true and correct. Executed this 27th day of September, 2018 in Colorado Springs, CO.

*Ginger Kathrens*

Ginger Kathrens

15

## DECLARATION OF GINGER KATHRENS

## ATTACHMENT 1:

## Photos Taken by Ginger Kathrens at the Hines Corral



*Photo 1: The Sign for the Hines Corral*



*Photo 2: Observation of a Procedure in the Hines Corral*



U.S. DEPARTMENT OF THE INTERIOR
**BUREAU OF LAND MANAGEMENT (/)**

# BLM ANNOUNCES THREE SELECTIONS FOR NATIONAL WILD HORSE AND BURRO ADVISORY BOARD

The Bureau of Land Management announced today the selections for three open positions on its nine-member National Wild Horse and Burro Advisory Board. Ginger Kathrens of Fort Collins, Colorado, has been appointed for the category of humane advocacy; Ben Masters of Bozeman, Montana, has been appointed for the category of wildlife management; and Steven Yardley of Beaver, Utah, has been appointed for the category of livestock management. Each individual will serve a three-year term on the Advisory Board.

Ms. Kathrens is the Founder and Executive Director of the Colorado-based Cloud Foundation, a non-profit organization dedicated to the preservation of wild horses on public lands. Kathrens is an Emmy award-winning creator of the acclaimed Public Broadcasting System series documenting the birth and life of a Pryor Mountains (Montana) wild stallion called "Cloud." Her first Cloud film was voted the most popular documentary in the 25-year history of the Nature series on PBS. Kathrens is an honor graduate of Bowling Green State University and holds a Master of Art's degree in Mass Communications from Florida State University.

Mr. Masters, founder and Chief Executive Officer of Fin & Fur Films, LLC is best known for his successful documentary Unbranded, an account of a 3,000-mile ride on wild horses that has raised awareness of the BLM's adoption program and the myriad challenges facing public land managers. Masters holds a Bachelor of Science degree in Wildlife and Fisheries Sciences from Texas A&M University.

Mr. Yardley, Vice President of Yardley Cattle Company, is a public land rancher and private landowner who holds grazing permits from the BLM and the U.S. Forest Service. A graduate of Southern Utah University, Yardley has been active with the Future Farmers of America, Utah Cattlemen's Association, National Cattlemen's Beef Association, and Southern Utah University's Block and Bridle Club. Currently, Mr. Yardley serves as Vice President of the Western Rangelands Conservation Association.

The National Wild Horse and Burro Advisory Board advises the BLM, an agency of the Interior Department, and the U.S. Forest Service, part of the Agriculture Department, on the management and protection of wild free-roaming horses and burros on public lands and national forests administered by those agencies, as mandated by the 1971 Wild Free-Roaming Horses and Burros Act. Members of the board, who represent various categories of interests, must have a demonstrated ability to analyze information, evaluate programs, identify problems, work collaboratively, and develop corrective actions. (Information about the board can be found at: **http://www.blm.gov/wo/st/en/prog/whbprogram/Advisory_Board.html (https://www.blm.gov/programs/wild-horse-and-burro/get-involved/advisory-board)**.)

Among its current efforts to strengthen the Wild Horse and Burro Program, the BLM has been moving forward with a population-growth suppression strategy consistent with recommendations of a National Academy of Sciences study issued in June 2013. The agency's new population growth-suppression research, representing an investment of approximately $11 million in 20 research projects over five years, will focus on (1) developing longer-lasting fertility-control agents; (2) evaluating the safety, feasibility, and effectiveness of spaying and neutering on-range wild horses; and (3) implementing better methods for estimating wild horse and burro populations. To achieve those aims, the BLM is working with the U.S. Geological Survey (USGS) and five universities -- the University of Kentucky, Oregon State University, Colorado State University, Ohio State University, and Louisiana State University. Detailed information about each project has been posted on the agency's Website (**www.blm.gov (https://www.blm.gov/)**).

The BLM manages more than 245 million acres of public land located primarily in 12 Western states, including Alaska. The BLM also administers 700 million acres of sub-surface mineral estate throughout the nation. The agency's mission is to sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations. Diverse activities authorized on these lands generated $75 billion in sales of goods and services throughout the

American economy in fiscal year 2016 - more than any other agency in the Department of the Interior. These activities supported more than 372,000 jobs.

**MORE PRESS RELEASES**

RELEASE DATE

Monday, March 28, 2016

ORGANIZATION

BLM

OFFICE

National Office

CONTACTS

**Name:** Tom Gorey
**Phone:** 202-912-7420

ATTACHMENTS